And now we will hear argument in the last case for the day, which is OCM Group USA, Inc. v. Lin's Waha International Corp. We have one counsel appearing by video and another here live. Give us a second for counsel to approach. Mr. Chadwick, you're representing the appellate, right? That's correct. Very well. All right. Please proceed. I'd like to reserve three minutes for rebuttal. Okay. We'll try to help you, but keep your eye on the clock, if you will, please. May it please the Court, William Chadwick on behalf of Plaintiff Appellate OCM Group USA, Inc. Summary judgment against OCM and the subsequent fees award are inappropriate because there is a genuine dispute as to whether or not consumers are likely to find material differences between OCM's products and Lin's Waha products. I get that point, but can you tell me exactly what your theory is on how these products differ materially? I'm baffled by it, frankly. Tell me out, would you please? The first point is that Lin's Waha products were never intended to be sold in the United States, and as a result, they were used, the milk that was used in them was sourced from countries that were not free of foot and mouth disease. They were not tested for USDA or APHIS compliance, and as a result, they did not comply with the USDA and APHIS. We're kind of talking about what consumers care about, right? Absolutely. Do you have any evidence that any consumer of these products was even aware of any of the claims that you're making about regulatory lack of compliance, foot and mouth disease, and the like? Is there any evidence like that? There's not a consumer survey, or there's not a— Can anybody testify? I'm a consumer. I heard about that. I wouldn't think of buying that because it's terrible. It's New Zealand milk. Or is it? No, Your Honor, but that is not uncommon in these great goods type cases. That sort of evidence has not come out in the majority of the cases that underline this. I get that, but I think you will admit as an experienced lawyer that this is a tough one. You're talking about products that at least from the perspective of almost 99 percent of the world would be entirely the same. You're talking about real technicalities about where the milk came from and whether there's foot and mouth disease in certain areas and whether or not they qualified with USDA and other requirements. And I'm struggling with how that helps you. I'm really looking for this material difference, and I'm not seeing it. So one point is that this bar is very low. The courts repeatedly stress that the bar is low as to what constitutes a material difference, and that is because the core of this is whether or not consumers would be confused. The core is whether or not consumers would look at these products that are identically packaged, identically branded, and whether or not they would assume that there was some overlap in the source. And so we have examples in the case. They have to care, right, about the difference, right? It has to be material or relevant. Yeah, which I think maybe I'd say care, but like material or relevant to the consumer. And so is the test that, like, it would be material if they knew about it, you know, if they're walking up to buy their favorite milk drink and somebody said, ooh, I suppose like if you said that one could have foot and mouth disease in it, which I'm not sure if that's true or not, but, you know, I suppose that might scare somebody a little bit. Is the test whether they would care or whether it would be material or relevant to them if somebody informed them of it, or is the test whether it is, because ultimately I think it's got to be the case that, like, nobody knows about this difference between these two, right? So it's not material or relevant to them because, first of all, it's just not even on their radar. I think the standard is if they knew. We have examples where there are differences that are not immediately apparent. There's a PepsiCo case where there's a slight difference in container volume that the court says would not be immediately apparent to consumers, and that was found to be a material difference. We have cases where there is a one-half degree, one-half calorie difference in a breath mint that would not be immediately apparent to consumers, but is yet still a material difference. This is not a genuine good. The consumers are not getting what they think they are getting when they purchase it. So you're saying it really doesn't matter what actual consumers think, it's what the hypothetical consumer might think if they knew about the milk differences? Well, the standard is would consumers be likely to find it material? And I think implied in that is if they knew. And in your judgment, how do we determine that? Put it in front of a jury. How do you prove this? What I would say to a jury is that foot-and-mouth disease is one of the most devastating livestock diseases, and one set of goods was never intended to come to the United States because the United States has heightened restrictions. And sure enough, when they tried to import it to the United States, using milk that wasn't supposed to come to the United States, it was seized. It was destroyed by the USDA. But we don't know why, right? I mean, you've got correlation. We don't know if that's why, as I understood. What we know from the face of the two separate emergency action notifications is that they violated 9 CFR 94. But there's a lot of different ways you could violate that. One of them could be this, but one could be something else, right? There's only two reasons why a milk-based product from China would violate. That's 9 CFR 94.16. That controls the importation of liquid milk and dry milk products from countries that are and are not free of foot-and-mouth disease. Everything else involves importing swine and garbage. Your position is that we do know that the reason that these were barred from importation was because of this issue. Is that your position here this morning? The evidence on the face of the seizure documents is a violation of 9 CFR 94. I don't think it matters what the actual violation is. But that being said, there are only two that would apply. One is that it wasn't sealed correctly. It wasn't processed correctly to be shelf-stable. The other is that it wasn't consigned for more processing in a way that would reduce the spread of livestock diseases. Both of those, I think that it is not a stretch to say would be very relevant to consumers. Well, let's go back to something I asked you a little bit earlier, which was let's assume hypothetically, just arguendo, don't worry. The arguendo that we reversed is to send it back to summary judgment, and you have a jury. Do I understand you correctly that we're going to ask the jury to basically parse through some federal regulations, very dense federal regulations, and further the specific part of those regulations applied here in a way that would be material to consumers? Is that what we'd be asking them to do? No, no. What would we be asking them to do? We'd be asking them a few things to determine whether they think a consumer would find it likely to be material under this low bar. And one would be it comes from different regions. We have milk source from China. We have milk source from Australia and New Zealand. One is that they were inspected differently, or, excuse me, tested differently. One was tested for USDA and APHIS compliance. One was not. The next is whether or not one set of goods was seized at the border for some violation. One set of goods was seized and one wasn't. And one is not just any regulation, a regulation designed, intended to stop the spread of deadly diseases to livestock. And so we would ask a jury with these facts, do you think consumers would find this material if they knew about it? Do you think consumers, under the very low bar for what constitutes a material difference, would they find these two groups of goods? Would that be relevant to their purchasing decision? Can I ask a question just out of curiosity? Are they still importing this gray market product, or has that effectively stopped? My understanding was it stopped, but has it started up again or something? Or is this no longer happening? As far as I'm aware, after the two consecutive seizures and destruction by the USDA, Binz-Wahhab did not challenge the seizures and abandoned its importation. As far as you know, they're not doing it anymore. They made about $25,000 or something profit, I thought I saw somewhere. I'm just trying to figure out why this case is even – what is the motivation for your client to be continuing this case? It doesn't seem to make sense financially, but I'm just curious. They have a right to appeal. I know, I know. I'm not saying like legally. I'm just trying to say like practically, is it because they want to be able to get a ruling that says it can't happen going forward? Or is it the attorney's fees? What is motivating it? One, they do have a permanent injunction. And two, there's an attorney fee award that's associated with this that are troubling and incorrect. Those are the two motivating – it seems like they're throwing good money after bad. But people can do that. I'm just curious. I'm trying to figure out what the motivation is. I think another is to clear the name that this is a brand that they've invested heavily in, that they've marketed heavily in, and that they are the exclusive – at the time were the exclusive distributor, and that was important for them to clear that space to enforce their rights and their mark and to be able to sell nationwide. So there's more than just, I think, this. They want to make sure nobody else tries to gray market this product into the – I think it's an important consideration, yes, Your Honor. But they presented evidence – or your client presented evidence to the district court that the products were identical in taste, quality, appearance, and safety, right, even if there is this regulatory difference between the source of the milk. The evidence that your client presented was that there were no safety concerns with the milk sourced from China. Isn't that correct? To humans. To humans, sure. To humans, but to livestock. So then circling back to Judge Smith's question, it's in the district court's problem was that there was no evidence in a consumer survey or expert testimony to suggest that identical products except for the source of the milk would – that would be a material difference to the consumers. I mean, so what's in the record that would support the notion that this would be a material difference? I want to clarify that the difference is not just the source of the milk. It's also the level of compliance with the U.S. import regulations of 9 CFR 94. But didn't what you cited as support for materiality were two court cases, two district court cases, right? I mean, so instead of citing facts, it seemed as if you were relying on case law to suggest these were material – the difference was material as a matter of law. You're right. There's not a consumer survey. But like I mentioned, that is not uncommon in these grey markets, these grey goods, especially at a summary judgment stage. So what is there? I mean, if it's not a survey, what evidence is there? That's what we're looking for. I think powerful evidence is the emergency action notifications. This is the seizure and destruction records from the USDA. This is the government saying this is not – For it to be material, it has to be relevant and also there has to – isn't there something that would suggest consumers would know about it? I don't think so. Like we discussed, there are cases that say that differences that are not apparent – we have Nestle, we have Hukdo, where consumers would not necessarily know that the mushrooms were grown in different circumstances. They would not necessarily know about the different quality control. These are things – But in the mushroom case, I thought there was evidence that whether the mushrooms were grown organically actually was material to consumers in the United States. Exactly, but they would not know that. And that's really what drives this is that they're – Okay, so where is the evidence that this regulatory difference would be material to consumers? It sounds like supposition, like this is such a horrible disease that would impact livestock in the United States. Consumers, if they knew about this, this would be material to them, but there's no evidence of that. That is an inference that we're asking, and OCM is entitled to reasonable inferences from the facts at summary judgment stage, the facts being the devastating nature of the disease, the facts being that certain ones were seized, the facts being that they were not tested for this, that the reasonable inference is that consumers would care. Some of the products at issue don't even include milk. Is that true? I thought there were three of the products that you were litigating about that didn't have milk products in it. That's correct. Okay, so those three would seem to be out. That's correct. What do we do with the fact, as I look at it, that you really haven't even shown that China, unlike Australia and New Zealand, is a region that the USDA considers likely to be affected with foot and mouth disease at relevant times? 9 CFR 94.1 says that all regions are affected with foot and mouth disease unless we specifically say otherwise. To find the regions that we specifically say otherwise, look at this link within the section. So, in other words, you're saying that the regulation says the whole world has got foot and mouth disease unless you prove otherwise? Is that what you're saying? And then the link within that section lists all sorts of regions that have been declared free of foot and mouth disease. Australia and New Zealand. And you're saying that that's how you extrapolate that China is not exempted? It's not extrapolation, Your Honor. APHIS, as part of the USDA, specifically says these regions are and everything else is not free of foot and mouth disease. Because of the devastating nature, they take an extremely conservative approach. Unless we've affirmatively declared it free, it is not free. Do you want to save any of your time? Yes, I'd love to. There's not much left. But thank you, Your Honor. Okay. Very well. All right. So, Mr. Witko. Good morning, Your Honors. My name is Brandon Witko, and I represent the Respondent Lynn Waha Corporation. I'd like to also reserve three minutes of my time for rebuttal. Well, you know, we really don't do that with appellees, but you can call it whatever you wish. You've got the time. If you want to say this part of my argument is a rebuttal, that's up to you. Understood. As the district court noted when granting summary judgment here, this case comes down to the burden of proof. And to defeat summary judgment, OCM had the burden of showing specific facts to create a genuine issue for trial. And OCM did not provide any of those facts to this court and is essentially trying a do-over at the appellate level. They made no effort. They only served a handful of document requests and interrogatories. They took no depositions, engaged no experts, and served no subpoenas to obtain evidence of these alleged material differences between the products. And instead, they are simply relying on these two emergency action notifications. And they characterized this failure in their reply brief as a strategic decision, quote, unquote. But no stones were kicked over. And my client was forced to then proceed with a summary judgment motion based upon its facts. And the court granted that and found that there was an exceptional case at issue. I think, Judge Smith, you hit the nail on the head when you asked my colleague about whether the differences need to be material to a consumer. And that's exactly correct. And the HOCTO case holds that. Here, my colleague admits that their whole case is based upon the existence of these two emergency action notifications, which are excerpts of record 54 and 55. And those were just two shipments of many that Linz-Waha imported. There were, in fact, 5,300 units in total, 5,300-plus in total, over the course of, I think, almost two years that were imported. But these emergency action notifications only address a very small handful. There is zero evidence in the record that, as I think my colleague stated in his briefing, that it's a majority of those products. In fact, it's a small minority. Moreover, there are nine products. Can I ask you about that, counsel? I'm not sure it matters, but is it that a whole bunch were imported and then the last two shipments were the ones that were rejected? Or is it that a whole bunch were imported, there were two shipments rejected, and then a whole bunch more were imported? No, I believe, Your Honor, these were the final shipments. And during this time is when the cease and desist letter was received by Linz-Waha. And there were discussions between Linz-Waha and OCM about these products.  My client elected not to challenge the destruction for the EAN. So that is the timeline at issue. And I also want to emphasize that there are nine products that Linz-Waha was sued over. I believe, as Judge Bates recognized, only two of those products involve liquid milk. Four of the products involve pea-based products, and two of the products are dry milk. And 9 CFR 94, which is cited in the EAN, has a specific exemption section dealing with dry milk. I believe that's 9 CFR 94.16B. So we're really talking about two products of the nine that Linz-Waha was sued over. And yet these two pages of emergency action notification do not disclose anything on its face as to whether Linz-Waha products violated this regulation. They don't identify any facts about how Linz-Waha's products violated this regulation or any specific facts showing that any such violation would be relevant to consumers. And instead, we're left with counsel's argument, and it's only counsel's argument, about whether, how, and why these products violated 9 CFR 94. There's nothing in the record that was submitted, like I believe Your Honors recognized. There's no analysis of the actual products that were imported for two years. They could have bought them on the shelf. There is no deposition testimony of USDA officials about the basis for this seizure. There is no expert analysis about importation requirements. There's just nothing there. Again, this goes back to OCM's intentional decision to not take discovery. Counsel, let me ask you. I want to shift to a different part of the case, and that's the attorney fees, and it kind of goes back to the evidentiary issue. My understanding of your argument and, indeed, of reading the district court's decision is that this was essentially a complete failure of the evidence required to prove anything, basically, and that's the reason they awarded attorney fees. Is that right? Is that what happened here? Essentially, yes, that the court found this case exceptional and issued attorney fees because of, I believe it was mentioned various times in the court's order, that there was no specific facts identified or admissible facts identified to rebut the grounds for summary judgment. The five pieces of evidence that OCM relied on to oppose the summary judgment, there were five things. Number one, veterinary certificates for its own products to show compliance. But the court recognized that those veterinary certificates were not for the actual products at issue here that Linz-Waha was being sued for, and they were also outside the relevant time period when Linz-Waha's products were being imported. Second, the emergency action notifications, which I think we've talked about, make no mention of why those products were seized and there was no discovery taken by OCM. Thirdly, the declarations that were submitted by OCM relate only to the exclusivity right of OCM. They have nothing to do with the material differences. And in fact, in one of the declarations from XPP, they admit that there's no safety issues or quality issues. And fourth, or fifth, the visual comparison of the products. OCM made no attempt to demonstrate any material differences because they are, in fact, identical. And Linz-Waha submitted extensive photographic evidence, a side-by-side comparison of the products that are being sold. And so therefore, the court, under the Coley-Floring case, found the case exceptional where there is a, quote, utter failure of proof. So you're saying, I guess the question I'm struggling with is what makes this exceptional rather than just a bad case or a weak case? Why does that become exceptional? I think under the exceptional standard, and when you have a, quote, utter failure of proof under Coley, there needed to be some effort by the, and this, again, this is the plaintiff in this case, not the defendant, you know, to prove specific facts to, even if they were to lose, but at least to make a good faith attempt to dispute the basis for this claim. And, Your Honors, Linz-Waha put OCM on notice early in the case, and that is in the exceptional case briefing, of this gray market goods, no material difference to consumers argument. And they knew exactly where we were going. It was in our joint report and initial disclosures as well. And they intentionally chose to litigate for a year and a half this case and not make any effort to develop any evidence of why this takes it out of the gray market goods environment and that there, in fact, are material differences for consumers. So this wasn't a surprise that was thrown upon OCM at the summary judgment stage, and therefore they were, you know, struggling within a 45-day time period of their opposition brief to put together evidence. They had known about this, these deficiencies in their case, since the outset. And they stuck to their guns. And so we were, Linz-Waha was forced to move for summary judgment, and they incurred very reasonable fees over a year and a half period. The attorney's fees award was $66,000, which included the summary judgment briefing, to defend this case. And so I believe that the basis for the attorney's fees reward is both justified under the COLA standard and the amount of the attorney's fees award is more than reasonable. Did the judge perform any kind of, like, lodestar analysis of the fees requested? I don't think it was a per se lodestar. I believe Your Honor has the award in its record, in the record. But it was certainly a limited lodestar analysis that went over the qualifications, the number of hours, the billing, invoices were submitted in unredacted form. So I wouldn't say it was a traditional lodestar, given the size. You know, this wasn't a significantly large attorney's fees request. So from your perspective, a year and a half, regular consultation with the other side, they didn't do anything to resolve it and left you no choice? That's exactly right, Your Honor. There was no other way to get out of this case, other than go to trial. So a summary judgment motion was certainly warranted. I'm sorry, I may have missed this in the briefing, but I didn't think they disputed the amount of the fees, just the award itself. Is that correct? That is correct. There was very little opposition to the attorney's fees motion in and of itself. It was basically a recitation of the argument made in opposition to the summary judgment motion, and the court recognized that in the order, that this wasn't the time or place to try and re-litigate the same argument that had already been denied at the summary judgment stage. So I take it you opposed their request that we take judicial notice of the CFR section. Is that correct? That is correct. And why? That is correct. Why? It was not in the record, Your Honor, at the summary judgment stage, and I'm looking for the case that holds that. It's certainly in my briefing. And then second, the 9 CFR 94, and my colleague did accurately reference the AFIS link in there, but the AFIS link that they submitted was from 2021, again, outside the relevant time period. There was no AFIS link showing China listed as an accepted country in 2019. You had a question? So is your client – do you know if your client is still importing these products now? They are not, Your Honor. We ceased it upon the time we were just discussing settlement of this dispute, and we did not challenge those emergency action notifications. There just wasn't the volume of sales and interest in the United States to warrant continuing importing these products. So I understand – so I understand what the emergency action notification – does that only pertain to that particular shipment, or does that emergency action notification somehow keep you from being able to bring in a future shipment? No, it only applies to two shipments, Your Honor. And in fact, we submitted evidence in the record of – I believe it's in the record of 49 through 51 and 118 of other import bills of lading that were approved and passed through the USDA. There was no challenge to any of the other importation of products other than just these two shipments. But again, what you're referencing now, those were shipments that were before the two that were – okay. That is correct, yes. But there were products – the same products that were in the two shipments that were seized were also contained in those prior shipments that passed through. So in sum, just to summarize, you know, this boils down to a lack of evidence. And the basis for the appeal is essentially a do-over for deficiencies that were solely within the control of OCM at the summary judgment and district court stage. And that's all I know. Very well. Other questions by my colleague? Thank you, counsel. All right. Mr. Chadwick, you've got a little bit of time left. You only had 18 seconds on the clock, but we're going to give you a minute so you can run with that. Thank you, Your Honor. A few quick points. OCM submitted a declaration from the manufacturer of the products. The same manufacturer made the products that Linsuaha sold and OCM sold. And in this declaration, the manufacturer declared that the products sold to Linsuaha were not compliant with the USDA standards and were never intended to come to America. And so there's a big deal made about the visual similarities of these products, even in the Attorney's Fee Award, and that really cuts in OCM's favor. The more similar the products are, the more subtle the difference has to be in order to find consumer confusion. In Nestle, the First Circuit case, it says if they are blatantly different, then we're not concerned with consumers being confused. It is the subtle differences, especially because of the identical nature of the packaging. If consumers do not find it relevant that their drinks could cause an outbreak of foot-and-mouth disease, it's hard for me to see what would be a material difference. I'm sorry, I have to ask you one question. You rely on 9 CFR Section 94 to establish that China is not on the list of cleared countries, so milk products from China could be dangerous and cause a foot-and-mouth disease outbreak. But I think that is in your request that we take judicial notice, correct? That's not evidence that was before the district court? That is in the request for judicial notice that China is subject to the heightened import standards under 9 CFR 94. And it's not dated. Is that correct? Is there a date on it anywhere that tells us it was relevant or it was applicable at the relevant time period? The one that is submitted is from 2021. There's no evidence that somehow China was free and became unfree, that there was some outbreak at any point. Other questions? Thank you very much. To both counsels, the case just argued is submitted and the court stands adjourned for the week. All rise.
judges: SMITH, BADE, VANDYKE